UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

Charles O'Bryant, on behalf himself and )
all other similarly situated, )
 )
Plaintiff, )     Civil Action No. 2:21-cv-3501-BHH
 )
 )     **Opinion and Order**
v. )
 )
Flowers Foods, Inc. and Derst Baking )
Company LLC, )
 )
Defendants. )
_____ )

This matter is before the Court on Defendants Flowers Foods, Inc. and Derst

Baking Company LLC's ("Defendants") motion to dismiss or, in the alternative to compel

arbitration. (ECF No. 15.) For the reasons set forth in this order, Defendants' motion is

granted and this action is dismissed in favor of arbitration.

## BACKGROUND

**A. The Relationship Between the Parties**

On June 8, 2015, Plaintiff Charles O'Bryant ("Plaintiff") entered into a Distributor

Agreement with Derst Baking Company LLC ("Derst"), a wholly-owned subsidiary of

Flowers Foods, Inc. ("Flowers"), whereby Plaintiff purchased rights to deliver Defendants'

fresh-baked products to customers in a defined geographic territory. (Lilly Decl. ¶¶ 1, 6

and Attach. 1, ECF No 15-2.) On December 18, 2015, Plaintiff signed an Amendment to

the Distributor Agreement that included, among other things, an Arbitration Agreement

which required mandatory and binding arbitration of all disputes with Derst and its

affiliated companies. (Lilly Decl. Attach. 3, ECF No. 15-2 at 60–67.) As consideration for

this amendment, Plaintiff received valuable consideration, including substantive revisions to his existing Distributor Agreement and payment of additional money. (Lilly Decl. ¶ 8.)

On February 12, 2018, Plaintiff purchased a second territory from another independent distributor, thereby assuming obligations and acquiring rights under a similar Distributor Agreement with Derst as to the second territory. (*Id.* ¶ 7 and Attach. 2.) Later, Plaintiff sold his first and second territories to new owners on May 7, 2018 and December 7, 2020, respectively. (*Id.* ¶ 9.) Thus, Plaintiff has not been a distributor franchisee with Derst since December 7, 2020.

Plaintiff filed the instant suit, alleging that he was misclassified as an independent contractor, rather than an employee under the Fair Labor Standards Act ("FLSA"), and that Defendants failed to properly pay him in violation of the FLSA and the South Carolina Payment of Wages Act ("SCPWA"). (Compl. ¶¶ 1–2, ECF No. 1.) Plaintiff brings this suit as a putative class and collective action, seeking to represent all other "similarly situated" distributors within the "statutory period covered by this Complaint." (Compl. ¶ 3.) Defendants contend that both the suit itself, and its specific character as a putative class and collective action, are prohibited by the Arbitration Agreement. At this time, one other distributor seeks to join the case.[1] That individual also signed a materially similar arbitration agreement containing promises to arbitrate the claims Plaintiff purports to bring on his behalf. (*See* Lilly Decl. Attach. 4, ECF No. 15-2 at 69–78.) The Arbitration Agreement contains a class and collective action waiver, requiring individual arbitration of the type of claims asserted in Plaintiff's complaint. (ECF No. 15-2 at 65.) The Court is informed that prior to filing the instant motion to dismiss, Defendants' counsel explained

---

[1] On December 7, 2021, Lee Parker filed a Notice of Consent to Join. (ECF No. 11.) The filing is unclear, but it appears Mr. Parker seeks to join the action as an opt-in plaintiff as opposed to a named plaintiff.

the arbitration requirement to Plaintiff's counsel, but Plaintiff has not consented to arbitration of his claims. Therefore, Defendants request that the Court dismiss this lawsuit pursuant to Federal Rule of Civil Procedure 12(b)(1) and the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1, *et seq.*, or, in the alternative, compel individual arbitration. (*See* ECF No. 15.)

### B. The Arbitration Agreement

The Arbitration Agreement applies to any and all claims pertaining to Plaintiff's Distributor Agreement and "any other association that DISTRIBUTOR may have with COMPANY." (ECF No. 15-2 at 64.) It explicitly covers any claims challenging Plaintiff's status as an independent contractor status and claims for compensation:

> The parties agree that any claim, dispute, and/or controversy except as specifically excluded herein, that either DISTRIBUTOR may have against COMPANY (and/or its affiliated companies . . . ) or that COMPANY may have against DISTRIBUTOR . . . arising from, related to, or having any relationship or connection whatsoever with the Distributor Agreement between DISTRIBUTOR and COMPANY, including . . . any other association that DISTRIBUTOR may have with COMPANY ("Covered Claims") shall be submitted to and determined exclusively by binding arbitration under the Federal Arbitration Act (9 U.S.C. §§ 1, et seq.) ("FAA") in conformity with the Commercial Arbitration Rules of the American Arbitration Association ("AAA" or "AAA Rules"), or any successor rules, except as otherwise agreed to by the parties and/or specified herein. . . .
>
> * * *
>
> Covered Claims covered under this Arbitration Agreement include, but are not limited to: breach of contract, any claims challenging the independent contractor status of DISTRIBUTOR, claims alleging that DISTRIBUTOR was misclassified as an independent contractor, any other claims premised upon DISTRIBUTOR's alleged status as anything other than an independent contractor, . . . claims for alleged unpaid compensation, . . . or statutory penalties under either federal or state law.

(*Id.* at 64–65.) The Arbitration Agreement also requires that covered claims must be brought on an individual basis:

3

All Covered Claims against COMPANY must be brought by DISTRIBUTOR on an individual basis only and not as a plaintiff or class member in any purported class, collective, representative, or multi-plaintiff action. DISTRIBUTOR further agrees that if it is within any such class, collective, representative, or multi-plaintiff action, it will take all steps necessary to opt-out of the action or refrain from opting in or joining, as the case may be, and DISTRIBUTOR expressly waives any right to recover any relief from any such class, collective, representative, or multi-plaintiff action. Similarly, all Covered Claims by COMPANY against DISTRIBUTOR may not be brought as a plaintiff or class member in any purported class, collective, representative, or multi-plaintiff action. The parties understand that there is no right or authority for any Covered Claim to be heard or arbitrated on a multi-plaintiff, collective, or class action basis, as a private attorney general, or any other representative basis. The parties understand that there are no bench or jury trials and no class, collective, representative, or multi-plaintiff actions are permitted under this Arbitration Agreement. . . .

(*Id.*) Moreover, the Arbitration Agreement prominently discloses the class and collective action waiver, stating the following in bold, capital letters:

**TO THE MAXIMUM EXTENT PERMITTED BY LAW, BOTH PARTIES EXPLICIT[L]Y WAIVE ANY RIGHT TO: (1) INITIATE OR MAINTAIN ANY COVERED CLAIM ON A CLASS, COLLECTIVE, REPRESENTATIVE, OR MULTI-PLAINTIFF BASIS EITHER IN COURT OR ARBITRATION; (2) SERVE OR PARTICIPATE AS A REPRESENTATIVE OF ANY SUCH CLASS, COLLECTIVE, OR REPRESENTATIVE ACTION; (3) SERVE OR PARTICIPATE AS A MEMBER OF ANY SUCH CLASS, COLLECTIVE, OR REPRESENTATIVE ACTION; OR (4) RECOVER ANY RELIEF FROM ANY SUCH CLASS, COLLECTIVE, REPRESENTATIVE, OR MULTI-PLAINTIFF ACTION.**

(*Id.* at 65 (emphasis in original).)

The Arbitration Agreement states that "[a]ny issues concerning arbitrability of a particular issue or claim under this Arbitration Agreement (except for those concerning the validity or enforceability of the prohibition against class, collective, representative, or multi-plaintiff action arbitration and/or applicability of the FAA) shall be resolved by the arbitrator, not a court." (*Id.*) The Arbitration Agreement also contains, *inter alia*, the following acknowledgments emphasized in bold text: (1) "**DISTRIBUTOR acknowledges**

**that this is an important document that affects its legal rights and that the DISTRIBUTOR has been given the opportunity to discuss this Arbitration Agreement with private legal counsel.**"; and (2) "**DISTRIBUTOR understands that this Arbitration Agreement requires that disputes that involve matters subject to the Agreement be submitted to arbitration pursuant to the Arbitration Agreement rather than to a judge or jury in court and that such disputes must be brought on an individual basis only.**" (*Id.* at 66–67 (emphasis in original).)

Under the Arbitration Agreement, Derst ("the Company") agreed to pay for all filing fees and costs customarily associated with American Arbitration Association ("AAA") arbitration, subject to the arbitrator's ability to award the Company costs and fees as the prevailing party. (*Id.* at 64.) By its terms, both the agreement to arbitrate covered claims and the class/collective action waiver are mutual, the arbitration is conducted by a neutral arbitrator, and the arbitrator has the authority to award the same damages and other relief that would have been available in court under applicable law, including attorneys' fees and costs. (*Id.*) The Arbitration Agreement states that it shall be governed by the FAA, as well as Georgia law to the extent Georgia law is not inconsistent with the FAA. (*Id.* at 66.)

## **LEGAL STANDARD**

The FAA reflects a liberal policy favoring arbitration and the enforcement of arbitration agreements. 9 U.S.C. § 1, *et seq.*; *AT&T Mobility, LLC v. Conception*, 131 S. Ct. 1740, 1745 (2011); *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 25–26 (1991); *Adkins v. Labor Ready, Inc.*, 303 F.3d 496, 500 (4th Cir. 2002); *Reeves v. Charleston Nut Co., Inc.*, No. CA 2:14-4807-PMD, 2015 WL 2091907, at *2–*3 (D.S.C. May 5, 2015). Under the FAA, "a written provision in any . . . contract evidencing a

transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2; *Gilmer*, 500 U.S. at 25–26. Section 4 of the FAA provides for a court order compelling arbitration when one party has failed, neglected, or refused to comply with an arbitration agreement. 9 U.S.C. § 4; *Gilmer*, 500 U.S. at 25. Both the Fourth Circuit and the Eleventh Circuit[2] have explained the strong federal policy in favor of arbitration and endorsed that policy as their own. *See Mey v. DIRECTV, LLC*, 971 F.3d 284, 292 (4th Cir. 2020) ("The heavy presumption of arbitrability requires that when the scope of the arbitration clause is open to question, a court must decide the question in favor of arbitration." (citation and quotation marks omitted)); *Burch v. P.J. Cheese, Inc.*, 861 F.3d 1338, 1346 (11th Cir. 2017) ("[D]oubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." (citation and quotation marks omitted)).

This presumption in favor of arbitration is equally applicable in Georgia. It is well-established that Georgia courts encourage arbitration to settle disputes. *See, e.g.*, *Davidson v. A.G. Edwards & Sons, Inc.*, 748 S.E.2d 300, 302–03 (Ga. Ct. App. 2013). In *BellSouth Corp. v. Forsee*, the Court of Appeals of Georgia explained:

> The [U.S.] Supreme Court has instructed that there is a presumption of arbitrability in the sense that an order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage.

---

[2] The choice of law provision in the Arbitration Agreement provides that the Arbitration Agreement shall be governed by the FAA and Georgia law. (ECF No. 15-2 at 66.) Plaintiff brought this action in the District of South Carolina and asserts that Fourth Circuit and South Carolina law, rather than Eleventh Circuit and Georgia law, should apply to this dispute because the Arbitration Agreement itself—and by derivation its choice of law provision—is invalid. (ECF No. 23 at 5 n.1.) This argument assumes its own conclusion and is unpersuasive. However, the result regarding enforceability of the Arbitration Agreement is the same whether the Court applies Fourth Circuit or Eleventh Circuit law, South Carolina or Georgia law. For ease of reference, the Court will focus its analysis on Eleventh Circuit and Georgia law.

> Accordingly, an injunction against arbitration is appropriate only where an asserted claim clearly falls outside of the substantive scope of the agreement.

595 S.E.2d 99, 101–02 (Ga. Ct. App. 2004) (cleaned up).

When analyzing a motion to compel arbitration, a court must determine whether the parties agreed to arbitrate the dispute. *Larsen v. Citibank FSB*, 871 F.3d 1295, 1302 (11th Cir. 2017) (citation omitted). Courts employ traditional principals of state contract law to determine whether there is a valid agreement to arbitrate, *see* 9 U.S.C. § 2, resolving any doubts about whether an agreement is enforceable—including defenses to arbitrability—in favor of arbitration. *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983). Courts adjudicating motions to compel arbitration conduct a two-step inquiry: (1) whether there is a valid agreement to arbitrate between the parties; and (2) whether the dispute in question falls within the scope of that arbitration agreement. *Lambert v. Austin Ind.*, 544 F.3d 1192, 1195 (11th Cir. 2008); *Lincoln v. G2 Secure Staff, LLC*, No. 2:20-cv-1954-DCN-MHC, 2020 WL 12772535, at *2 (D.S.C. Nov. 18, 2020), *adopted in*, 2021 WL 5936391 (D.S.C. Jan. 7, 2021) (citing *Chorley Enter., Inc. v. Dickey's Barbecue Rest., Inc.*, 807 F.3d 553, 563 (4th Cir. 2015)).

## DISCUSSION

### A. The Validity of the Arbitration Agreement

To determine whether Derst and Plaintiff agreed to arbitrate a given dispute, ordinary principles of state contract formation law apply. *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). Under the parties' contractual choice-of-law provision in the Distributor Agreement, Georgia law applies. (Lilly Decl., Attach. 1 § 21.15, Attach. 2 § 20.12, ECF No. 15-2 at 25, 55.) Likewise, the Arbitration Agreement provides that

Georgia law applies to the extent it is not inconsistent with the FAA. (Lilly Decl. Attach. 3, ECF No. 15-2 at 66.) As the party resisting arbitration, Plaintiff bears the burden of establishing that the Arbitration Agreement is inapplicable or invalid. *Green Tree Fin. Corp.-Alabama v. Randolph*, 531 U.S. 79, 91 (2000). The Court finds that Plaintiff cannot meet that burden.

First, the Arbitration Agreement is clear, unambiguous, and provided Plaintiff with ample and prominent notice of his rights. Plaintiff signed (or assumed) the Arbitration Agreement, after being explicitly advised that it affected his legal rights and that he may consult a lawyer. (*See* Lilly Decl. ¶ 8.) Plaintiff also had seven days after signing in which he could have elected to revoke the Arbitration Agreement, but he did not do so. (Lilly Decl. ¶ 8, Attach. 3 ¶ 16, ECF No. 15-2 at 2–3, 63.)

Second, the Arbitration Agreement is supported by adequate consideration under Georgia law, including monetary consideration, favorable amendment of other terms under the Distributor Agreement, and the mutuality of the obligation to arbitrate disputes with Derst agreeing to pay the full costs of arbitration. (*See id.* at 3, 66); *Caley v. Gulfstream Aerospace Corp.*, 428 F.3d 1359, 1376 (11th Cir. 2005) (holding arbitration agreement was not unenforceable for lack of consideration and stating "Georgia law provides that mutual promises and obligations are sufficient consideration to support a contract"); *Atlanta Six Flags P'ship v. Hughes*, 381 S.E.2d 605, 607 (Ga. Ct. App. 1989) ("[T]he mutual promises and obligations of the parties constituted sufficient consideration for the contract.").

Third, the terms of the Arbitration Agreement are fair and equitable. It allows the arbitrator to award Plaintiff the same damages and other relief to which he may otherwise

be entitled in court. (ECF No. 15-2 at 64.) Moreover, Defendants pay the filing fees and costs customarily associated with arbitration, among other procedural safeguards contained in the Arbitration Agreement, subject to the arbitrator's ability to award fees and costs to the prevailing party under applicable law. (*Id.*) Thus, any contractual defenses that sought to invalidate the Arbitration Agreement based on its substance would fail.

In his responsive briefing, Plaintiff argues that the Arbitration Agreement is unenforceable because it is an unlawful adhesion contract and because he purportedly lacked a meaningful choice. (ECF No. 23 at 9–10.) Attaching declarations in support, Plaintiff asserts that "the arbitration agreement . . . was forced upon Plaintiffs[3] under circumstances that make it an unconscionable contract of adhesion," to wit: (1) they had "no meaningful bargaining power[;]" (2) no one took the time or effort to ensure they understood the Arbitration Agreement; (3) Plaintiff O'Bryant's supervisor misrepresented what the Arbitration Agreement stated; and (4) the Arbitration Agreement was "thrust upon them in a 'take it or leave it' approach[.]" (*Id.*; ECF Nos. 23-1 & 23-2.)

Plaintiff's arguments lack merit. Even if these factual assertions were true, which Defendants dispute, Plaintiff has not demonstrated unconscionability under the law. Pursuant to Georgia law, "a contract can be challenged for procedural unconscionability, which addresses the process of making the contract, or substantive unconscionability, which looks to the contractual terms themselves." *Albertson v. Art Inst. of Atlanta*, No. 1:16-CV-3922-WSD, 2017 WL 1361293, at *5 (N.D. Ga. Apr. 14, 2017) (citing *Caley*, 428 F.3d at 1377). "[A]n unconscionable contract is 'such an agreement as no sane man not

_____

[3] Here, Plaintiff refers both to himself and to Lee Parker. As stated *supra*, the precise nature of Mr. Parker's joinder in this lawsuit is unclear. For purposes of addressing Plaintiff's arguments regarding the enforceability of the Arbitration Agreement the Court adopts Plaintiff's plural verbiage.

acting under a delusion would make and that no honest man would take advantage of.'" *Caley*, 428 F.3d at 1378 (quoting *Hall v. Fruehauf Corp.*, 346 S.E.2d 582, 583 (Ga. Ct. App. 1986)). "The burden of proving unconscionability is a stringent one." *Sims v. Select Portfolio Servicing, Inc.*, No. CV 108-064, 2008 WL 11349693, at *6 (S.D. Ga. Sept. 23, 2008). "For a contract to be found unconscionable under Georgia law, there generally must be both procedural and substantive unconscionability." *Clark v. Aaron's, Inc.*, 914 F. Supp. 2d 1301, 1310 (N.D. Ga. 2012) (citing *NEC Techs., Inc. v. Nelson*, 478 S.E.2d 769, 773 n.6 (1996) ("[T]o tip the scales in favor of unconscionability, most courts seem to require a certain quantum of procedural plus a certain quantum of substantive unconscionability.")). Here, Plaintiff only argues that the Arbitration Agreement is procedurally unconscionable.[4]

To determine whether a contact is procedurally unconscionable, courts assess the following factors: "'age, education, intelligence, business acumen and experience of parties, their relative bargaining power, the conspicuousness of and comprehensibility of the contract language, the oppressiveness of the terms, and the presence or absence of meaningful choice.'" *Caley*, 428 F.3d at 1377 (quoting *NEC Techs.*, 478 S.E.2d at 772). Courts have found that, despite the existence of bargaining disparity, an arbitration agreement is not procedurally unconscionable so long as its terms are not oppressive,

---

[4] If Plaintiff was to contend the Arbitration Agreement is substantively unconscionable, such an argument would be unavailing. To determine substantive unconscionability, "courts have focused on matters such as the commercial reasonableness of the contract terms, the purpose and effect of the terms, the allocation of the risks between the parties, and similar public policy concerns." *Stevenson v. Great Am. Dream, Inc.*, No. 1:12-CV-3359-TWT, 2014 WL 186101, at *2 (N.D. Ga. Jan. 16, 2014) (citation and quotation marks omitted). Georgia courts consistently find arbitration agreements are not unconscionable when their terms apply equally to both parties. *See, e.g.*, *Caley*, 428 F.3d at 1378 (holding arbitration agreement was not substantively unconscionable because it required both parties to arbitrate covered claims). Here, the parties mutually agreed to arbitrate. Specifically, the Arbitration Agreement applies equally to claims Plaintiff has against Defendants and claims Defendants have against Plaintiff. (ECF No. 15-2 at 64.)

and its terms are clear and presented to employees in a way that emphasizes the agreement's importance. *See, e.g.*, *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 32–33 (1991) (stating "[m]ere inequality in bargaining power . . . is not a sufficient reason" to render arbitration agreements unenforceable in a particular context, such as the employment context); *Nichols v. Murray Ford of Kinsland, Inc.*, CV 216-69, 2017 WL 149812, at *3 (S.D. Ga. Jan. 13, 2017) ("A mere lack of sophistication is insufficient to find an agreement unconscionable." (citation omitted)); *Saturna v. Bickley Constr. Co.*, 555 S.E.2d 825, 827 (Ga. Ct. App. 2001) ("[L]ack of sophistication or economic disadvantage of one attacking arbitration will not amount to unconscionability." (citation and quotation marks omitted)).

In addition, a party's reluctance to enter into an arbitration agreement, by itself, is insufficient to demonstrate procedural unconscionability. *Nichols*, 2017 WL 149812, at *4 (stating "to the extent that [p]laintiff argues that she lacked the bargaining power to renegotiate the [arbitration] agreement or ask for more time to consider the agreement, this argument also fails" to demonstrate the agreement was unconscionable); *see also Kramer v. Kroger Co.*, 534 S.E.2d 446, 450 (Ga. Ct. App. 2000) ("One may not void a contract on grounds of duress merely because he entered into it with reluctance, the contract is very disadvantageous to him, the bargaining power of the parties was unequal or there was some unfairness in the negotiations preceding the agreement." (citation omitted)). Furthermore, even if the Arbitration Agreement was presented on a take-it-or-leave it basis, which Defendants deny (*see* 2d Lilly Decl., ECF No. 26-2), it would not automatically be deemed unconscionable. *See In re Checking Account Overdraft Litig.*, 459 F. App'x 855, 859 (11th Cir. 2012) (citing *Crawford v. Results Oriented, Inc.*, 548

S.E.2d 342, 343 (Ga. 2001)) (reversing finding of procedural unconscionability, compelling arbitration, and stating, "[a]lthough the district court found troubling that the clause was presented to the [plaintiffs] 'on a take-it-or-leave-it basis with no opt-out provision,' under Georgia law, an adhesion contract is not per se unconscionable").

Even with the allegations in Plaintiff and Mr. Parker's declarations, Plaintiff fails to meet his burden of showing the Arbitration Agreement is unenforceable. The terms are not oppressive. Any bargaining disparity is simply not enough for the Court to determine the Arbitration Agreement is invalid, particularly when the Amendment to the Distributor Agreement was voluntary and Plaintiff had the opportunity to—but did not—revoke it. The terms of the Arbitration Agreement are straightforward and provided Plaintiff with ample and prominent notice of his rights. In sum, Plaintiff's Arbitration Agreement with Derst is clear, unambiguous, and balanced, and it contains mutual obligations along with other safeguards. As such, it is enforceable under both federal and Georgia law. *Caley*, 428 F.3d at 1368.

### B. The Scope of the Arbitration Agreement and the Transportation Workers Exemption

The Court's second inquiry considers whether the dispute in question falls within the scope of the Arbitration Agreement. *Anderson v. Am. Gen. Ins.*, 688 F. App'x 667, 669 (11th Cir. 2017) (citing *Lambert*, 544 F.3d at 1195). The Court is obligated to resolve doubts concerning the scope of arbitrable issues in favor of arbitration. *Burch*, 861 F.3d at 1346; *see also Long v. Silver*, 248 F.3d 309, 316 (4th Cir. 2001) ("[T]he heavy presumption of arbitrability requires that when the scope of the arbitration clause is open to question, a court must decide the question in favor of arbitration.").

At first blush, the inquiry has a simple answer: Plaintiff's misclassification claims

under state and federal law are expressly covered by the Arbitration Agreement, which requires individual "binding arbitration" for "[a]ll claims, disputes, and controversies arising out of or in any manner relating to" his Distributor Agreements, including "any claims challenging the independent contractor status of DISTRIBUTOR, claims alleging that DISTRIBUTOR was misclassified as an independent contractor, any other claims premised upon DISTRIBUTOR's alleged status as anything other than an independent contractor . . . and claims for alleged unpaid compensation . . . under either federal or state law." (Lilly Decl. Attach. 3, ECF No. 15-2 at 64–65.) Therefore, it is indisputable that the claims asserted in this lawsuit are "Covered Claims," as that term is defined in the Arbitration Agreement. (*See id.* at 65.)

Nor is there meaningful dispute that Plaintiff's asserted claims are subject to individual, as opposed to class or collective, arbitration. The Arbitration Agreement provides:

> The parties understand that there is no right or authority for any Covered Claim to be heard or arbitrated on a multi-plaintiff, collective, or class action basis . . . .
> **TO THE MAXIMUM EXTENT PERMITTED BY LAW, BOTH PARTIES EXPLICIT[L]Y WAIVE ANY RIGHT TO: (1) INITIATE OR MAINTAIN ANY COVERED CLAIM ON A CLASS, COLLECTIVE, REPRESENTATIVE, OR MULTI-PLAINTIFF BASIS EITHER IN COURT OR ARBITRATION . . . .**

(*Id.* at 64–65 (emphasis in original).) Pursuant to the plain terms of the Arbitration Agreement, the parties agreed that any claims brought by Plaintiff must proceed to arbitration on an individual basis. *See Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612 (2018) (enforcing arbitration agreements containing class action waivers where plaintiffs brought putative collective actions under the FLSA and accompanying state law class claims against employers seeking allegedly unpaid wages).

The real substance of the parties' disagreement as to the applicability of the Arbitration Agreement is their divergence on whether Plaintiff fits into the "transportation workers" exemption found in § 1 of the FAA. Section 1 of the FAA excludes coverage for "contracts of employment of seaman, railroad employees, or any other class of workers engaged in foreign or interstate commerce." 9 U.S.C. § 1. Plaintiff is obviously not a railroad employee or seaman. However, the gravamen of Plaintiff's opposition to the motion to dismiss is his assertion that he fits within the so-called "residual clause" of § 1, which applies to "any other class of workers engaged in foreign or interstate commerce." (*See* ECF No. 23 at 3–8.) For the following reasons, the Court finds that the residual clause is inapplicable here, rendering enforcement of the Arbitration Agreement appropriate under the FAA.

The Supreme Court has held that the FAA's transportation worker exemption "should be narrowly construed." *Hill v. Rent-A-Ctr., Inc.*, 398 F.3d 1286, 1290 (11th Cir. 2005) (citing *Cir. City Stores, Inc. v. Adams*, 532 U.S. 105, 115 (2001)). In *Hill*, the plaintiff, who served as an account manager for a business that rented furniture and appliances to customers on a rent-to-own basis, opposed his employer's motion to compel arbitration on the ground that he was a worker in interstate commerce and thus exempt from the mandatory arbitration provisions of the FAA because his job duties involved making delivery of goods to customers out of state in his employer's truck. 398 F.3d at 1288. The Eleventh Circuit held that, for purposes of § 1's residual clause, a "transportation worker" is an individual (1) employed in the transportation industry, (2) who is actually engaged in the transportation of goods in interstate commerce. *Id.* at 1290; *see Hamrick v. Partsfleet, LLC*, 1 F.4th 1337, 1344–46 (11th Cir. 2021) (indicating that analysis of the transportation

14

worker exemption is controlled by the binding precedent in *Hill* and stating "[t]he transportation worker exemption applies only if the worker belongs to a class of worker in the transportation industry and the class of workers actually engages in foreign or interstate commerce"). The *Hill* court distinguished workers who rightly qualify for the exemption pursuant to Congress's demonstrable concern for the free flow of goods in interstate commerce, from workers "who incidentally transport[] goods interstate as part of their job in an industry that would otherwise be unregulated," stating:

> There is no indication that Congress would be any more concerned about the regulation of the interstate transportation activity incidental to Hill's employment as an account manager, than it would in regulating the interstate "transportation" activities of an interstate traveling pharmaceutical salesman who incidentally delivered products in his travels, or a pizza delivery person who delivered pizza across a state line to a customer in a neighboring town.

> Thus, it is apparent Congress was concerned only with giving the arbitration exemption to "classes" of transportation workers within the transportation industry. Hill is clearly not a member of such a class. This decision is consistent with the overarching principle of a liberal federal policy favoring arbitration agreements. *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 24, 103 S. Ct. 927. To broaden the scope of § 1's arbitration exemption to encompass any employment disputes of a worker employed by a company whose business dealings happen to cross state lines, would allow § 1's exception to swallow the general policy requiring the enforcement of arbitration agreements as pronounced in § 2 of the FAA.

398 F.3d at 1289–90. The Court finds that Plaintiff cannot establish either prong of *Hill* and does not qualify for the transportation workers exemption.

First, Plaintiff does not work in the "transportation industry" because Defendants are bakeries, not carriers such as a railroad, a maritime shipping company, or a trucking company. To be a transportation worker, an individual must first be employed in the transportation industry. *Hill*, 398 F.3d at 1290. Courts—both in and out of the Fourth and Eleventh Circuits—have sought to determine the boundaries of what it means to work in

the transportation industry for purposes of § 1, interpreting the concept narrowly. *See,*
*e.g., O'Neil v. Hilton Head Hosp.*, 115 F.3d 272, 274 (4th Cir. 1997) (holding that § 1's
exemption is limited to "seamen, railroad workers, and other workers actually involved in
the interstate transport of goods," and stating, "If Congress had wished to exempt all
employees from the coverage of the FAA it could have said so. Instead, it enumerated an
exempt class of employees, which is limited to workers engaged in the shipment and
transportation of goods."). The Southern District of Texas provided a persuasive analysis,
linking identification of the relevant "industry" to the mission of the company at issue,
stating:

> [A] transportation worker is someone who works in the transportation
> industry—an industry whose mission it is to move goods. [Plaintiff] worked
> in the automobile industry—an industry whose mission it is to manufacture
> and sell automobiles. . . . His duties were not to transport goods on behalf
> of a carrier like a railroad or a vessel like a ship.

*Tran v. Texan Lincoln Mercury, Inc.*, No. CIV.A. H-071815, 2007 WL 2471616, at *5 (S.D.
Tex. Aug. 29, 2007).

Plaintiff's duties as a former distributor for Derst fall squarely within the baking
industry, not the transportation industry. Defendants are in the business of manufacturing
bread and bakery products (Lilly Decl. ¶ 2), not serving as carriers for other companies'
products like a railroad, maritime shipping, or over-the-road trucking company would be.
Derst—like every other business—needs to get its products to customers, and one of the
primary channels it uses to do so is a network of distributors, like Plaintiff, with which it
contracts. (*Id.* ¶¶ 3–4.) Unsurprisingly, those distributors use trucks to drive Derst's baked
products to retailers. However, this fact does not transform Derst from a baking company
into a transportation company, or its franchisees from distributors of baking products into

"transportation workers." As is true of most companies, Derst's transportation function is incidental to the overall mission of the business—to make and sell baked goods—and Plaintiff is therefore not part of a class of workers that would be properly categorized as within the transportation industry. *See, e.g.*, *Martins v. Flowers Foods, Inc.*, 852 F. App'x 519, 520 (11th Cir. 2021) (per curiam) (vacating district court's decision, which found baking company distributors qualified as transportation workers, in light of *Hamrick*); *Hamrick*, 1 F.4th at 1351 (explaining that *Hill* requires application of "the residual phrase 'class of workers engaged in foreign or interstate commerce' consistently with the other transportation workers mentioned in the exemption, 'seamen' and 'railroad employees'"); *Bean v. ES Partners, Inc.*, 533 F. Supp. 3d 1226, 1228, 1234 (S.D. Fla. 2021) (ordering arbitration and finding that route driver for "prescription courier service" was not "engaged in" interstate commerce for purposes of § 1's exemption, where driver received products that were manufactured in other states and delivered them locally). To find otherwise would cause § 1's residual clause exemption to swallow the rule and turn the presumption of arbitrability on its head.

Second, Plaintiff was not actually "engaged in foreign or interstate commerce" in the sense relevant to § 1's residual clause because his deliveries were purely intrastate. Plaintiff delivered goods within a single state—South Carolina. (Lilly Decl. ¶ 12.) Pursuant to the Distributor Agreements, Plaintiff owned the right to market, sell, and distribute certain products purchased from Derst within defined geographic areas, which were wholly inside South Carolina. (*Id.* ¶¶ 11–13.) Section 1's exemption applies to transportation workers like seamen and railroad employees engaged in foreign or interstate deliveries, and any other exempt workers must be defined in light of the

17

narrowness of these two categories. *See Circuit City*, 532 U.S. at 115–118 ("The application of the rule *ejusdem generis* in this case . . . is in full accord with other sound considerations bearing upon the proper interpretation of the clause."). Subsequent cases have construed § 1 to apply only to transportation workers whose duties include interstate deliveries—*i.e.*, actual crossing of state lines. *See Bean*, 533 F. Supp. 3d at 1228 (finding transportation workers exemption did not apply because driver did not transport good across state lines as part of his delivery responsibilities); *Levin v. Caviar, Inc.*, 146 F. Supp. 3d 1146, 1154 (N.D. Cal. 2015) ("[A] number of courts have held that local delivery drivers do not fall within the transportation exemption to the FAA."); *Bonner v. Mich. Logistics, Inc.*, 250 F. Supp. 3d 388, 396–97 (D. Ariz. 2017) (finding the FAA applied to delivery drivers and explaining that § 1 is "meant to exclude the contracts of workers who are literally engaged in the process of moving goods across state and national boundaries—workers like seamen and railroad employees").

Plaintiff cannot use his intrastate delivery of goods that were produced out of state and previously moved across state lines to satisfy the "interstate activity" prong of the *Hill* test. The Eleventh Circuit considered and rejected this premise in *Hamrick*, holding the district court erred by "focus[ing] on the movement of the goods and not the class of workers" in determining that drivers met the transportation worker exemption by completing a chain of transportation "from out of state merchants delivering to customers in the local area that the drivers serviced." 1 F.4th at 1351 (cleaned up). *Hamrick* confirmed a plaintiff must show that he "actually engage[d] in the transportation of person or property between points in one state (or country) and points in another state (or country)" in order to satisfy *Hill*'s "interstate activity" prong. *Id.* at 1350. Here, Plaintiff did

not cross state lines while delivering the products he sold to customers within the State of South Carolina. (Lilly Decl. ¶ 12.) Therefore, the residual clause of the FAA is not properly applied, and Plaintiff cannot establish that he is an exempt transportation worker under § 1 of the FAA.

## **CONCLUSION**

Because Plaintiff is not a transportation worker within the meaning of § 1 of the FAA and because he entered into a binding arbitration agreement with Defendants, the Court GRANTS the Defendants' motion to dismiss in favor of arbitration. The Clerk of Court shall enter judgment in favor of the Defendants accordingly and is instructed to close the case. If, after the arbitration, any party seeks further relief from the Court, the Clerk of the Court shall assign any such motion or petition to the undersigned.

**IT IS SO ORDERED.**

/s/ Bruce Howe Hendricks
United States District Judge

September 21, 2022
Charleston, South Carolina

19